**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

TARAH KISER and
RONALD KISER,

Plaintiffs,

v. Action No. 2:24cv435

TRUIST FINANCIAL CORPORATION,

Defendant.

**MEMORANDUM OPINION & ORDER**

Plaintiffs, Tarah Kiser and Ronald Kiser ("Kisers"), sued Truist Financial Corporation ("Truist") in July 2024, alleging that Truist forged their signatures on, and included false information in, two account-related forms. ECF No. 1; Am. Compl. ¶ 1, ECF No. 25. Truist moved to compel arbitration and stay this proceeding. ECF No. 45. The Kisers oppose the motion, arguing that they did not agree to arbitrate disputes with Truist and, even if they did, any arbitration agreement is illusory because Truist retained the ability to unilaterally modify it without providing notice. ECF No. 47. The Court held a hearing on the motion and has considered the parties' briefing and attachments thereto. Although the Kisers agreed to arbitrate disputes with Truist, the Court agrees with the Kisers that any arbitration agreement to which they may have agreed is illusory. Because there is no agreement to arbitrate, the Court cannot compel the Kisers to do so; therefore, Truist's renewed motion to compel arbitration, ECF No. 45, is **DENIED.**[1]

[1] Consistent with courts in the Fourth Circuit, the undersigned United States Magistrate Judge issues this memorandum opinion and order under 28 U.S.C. § 636(b)(1)(A) to dispose of Truist's non-dispositive, pre-trial motion to compel arbitration. *See Cullen v. Hall Auto., LLC*, No. 2:21cv47, 2022 WL 1262549, at *2 (E.D. Va. Apr. 28, 2022) ("Upon consideration . . . , the Court agrees with what it finds to be the weight of the relevant case law and holds . . . that the instant

## I. BACKGROUND

### A. Facts relevant to the Kisers' underlying claims.

The Kisers are husband and wife who live in Virginia. Am. Compl. ¶¶ 57–58, 151. Mr. Kiser worked as a financial advisor at Truist Investment Services, Inc. ("TIS"), an affiliate of Truist, and its predecessor, SunTrust Investment Services, Inc., *id.* ¶ 32, from 2005 until May 2021, *id.* ¶¶ 32, 38. Ms. Kiser is the owner of Beach Time Properties, LLC ("Beach Time"), a company "engaged in the purchase, sale, and rental of various properties." *Id.* ¶¶ 3, 64–65.

Between 2005 and 2016, the Kisers (jointly, individually, or in the name of a business entity) opened 15 accounts with Truist.[2] Def.'s Resps. & Objs. to Pls.' Interrogs. 6–7, ECF No. 46-2 ("Def.'s Interrogs. Resps."). In 2005, Ms. Kiser opened a bank account at Truist for Beach Time. Am. Compl. ¶ 67. She alleges that when she opened that account, she signed a "Business Account Signature Card" that contained only her signature and listed her as the only owner. *Id.*

---

motion [to compel arbitration] is non-dispositive."); *Cohen v. AT&T Mobility Servs. LLC*, No. 5:24cv302, 2024 WL 4439267, at *1 n.1 (E.D.N.C. Oct. 7, 2024) (United States Magistrate Judge ruling on a motion to compel arbitration); *Davis v. Young & Assocs., Inc.*, No. 1:20cv61, 2021 WL 4191384, at *1 n.1 (W.D. Va. Sept. 15, 2021) (same); *Scales v. SSC Winston-Salem Operating, Co.*, No. 1:17cv539, 2017 WL 4467278 (M.D.N.C. Oct. 5, 2017) (same); *Smith v. Am. Gen. Fin.*, No. 3:11cv97, 2011 WL 1059836 (W.D.N.C. Mar. 22, 2011) (same). Two federal appellate courts have approved of the disposition of such motions by United States Magistrate Judges. *See Patton v. Johnson*, 915 F.3d 827, 832 (1st Cir. 2019) (holding that a United States Magistrate Judge that "treated the . . . motion to compel arbitration as a dispositive motion and recommended a decision . . . err[ed] because a motion to compel arbitration is a non-dispositive motion . . . [and] an order, not a recommended decision, would have been the appropriate vehicle for the magistrate judge's findings and conclusions"); *Virgin Islands Water & Power Auth. v. Gen. Elec. Int'l Inc.*, 561 F. App'x 131, 133–34 (3d Cir. 2014) (holding that there is "no exercise of Article III power when a Magistrate Judge rules on a motion to compel arbitration" because such a motion "does not dispose of the case, or any claim or defense found therein" and orders granting such a motion "merely suspend the litigation while orders denying it continue the underlying litigation").

[2] In 2019, SunTrust Bank and BB&T Bank merged to form Truist Bank, a wholly owned subsidiary of defendant, Truist Financial Corporation. ECF No. 22-1, at 2. For clarity, the Court will refer only to Truist.

¶¶ 68–69 (citing ECF No. 25-1, at 18[3]). Sometime thereafter, the Kisers allege that Truist "forged" a replacement signature card, listing Mr. Kiser as a co-owner of Beach Time and forging his signature. *Id.* ¶¶ 71–72 (citing ECF No. 25-1, at 2). The Kisers allege that Truist placed their signatures on the replacement signature card. *Id.* ¶¶ 86, 90. In September 2019, Truist asked Ms. Kiser to sign a "Beneficial Ownership Form" related to a Beach Time account. *Id.* ¶ 96. According to the Kisers, Truist added false information to that form—including that Mr. Kiser is a 50% owner of Beach Time—"at some point after September 2019[.]" *Id.* ¶¶ 115–16.

Mr. Kiser was registered with the Financial Industry Regulatory Authority ("FINRA") as a financial advisor with TIS. *Id.* ¶ 33. FINRA requires financial advisors to disclose "any outside interests they may have such as ownership interests in any entities." *Id.* ¶ 35. Mr. Kiser alleges he did not disclose that he was an "owner" of Beach Time because he was not. *Id.* ¶ 36. After TIS terminated Mr. Kiser in May 2021, he initiated arbitration with FINRA against TIS. *Id.* ¶¶ 38, 118. At that time, Mr. Kiser believed that TIS terminated his employment due to an issue with his disclosure of his ownership interest in a business entity. *Id.* ¶ 40. The Kisers allege that they were unaware of the "forged" Beach Time documents until TIS produced them during discovery in the FINRA arbitration. *Id.* ¶¶ 118, 120–21. Now, the Kisers allege TIS terminated Mr. Kiser in 2021 because Truist forged the Beach Time signature card and beneficial ownership form. *Id.* ¶ 38.

---

[3] Except for deposition transcripts, the Court cites the electronic pagination found in the header of each filing on the docket in this memorandum opinion and order.

**B. Facts relevant to Truist's motion to compel arbitration.**

**1. Truist's account agreement.**

At least since 2005, "deposit accounts opened at [Truist] were governed by bank servicing agreements, called the Rules and Regulations for Deposit Accounts" ("account agreement").[4] Suppl. Decl. of Lori Hartwell ¶ 1, ECF No. 46-4 ("Hartwell Suppl. Decl."). Truist policy required its employees to provide customers with a copy of the account agreement at the time a new account was opened. Harris Dep. 12:13–23, 22:24–23:23, ECF No. 46-5.

Truist "periodically revised" the account agreement. Hartwell Suppl. Decl. ¶ 1. Truist, however, has only retained copies of the account agreements as of June 2010. Def.'s Mem. of Law in Supp. of Renewed Mot. to Compel Arbitration 12, ECF No. 46 ("Def.'s Mem."). The record contains no fewer than eight versions of account agreements. *See* ECF No. 22-1, at 7–66 (June 2019);[5] ECF No. 46-4, at 5–27 (June 2010), 29–53 (Feb. 2012), 55–110 (Sept. 2014), 112–38 (June 2016), 140–99 (Dec. 2019), 201–58 (June 2020), 260–317 (Dec. 2020); *see also* Hartwell Suppl. Decl. ¶¶ 2–7. Although they differ in some respects, there are many commonalities. Each provides that the account agreement governs the account; by opening the account, the depositor agrees to be bound by the account agreement even after the account is closed; and Truist may change the account agreement with or without notice unless the law requires it to provide notice. ECF No. 46-4, at 5 (June 2010), 29 (Feb. 2012), 56 (Sept. 2014), 113 (June 2016), 142 (Dec.

[4] The use of "account agreement" is interchangeable with "rules and regulations" in this memorandum opinion and order.

[5] Truist submitted two declarations from Lori Hartwell when it first moved to compel arbitration, ECF Nos. 22-1, 31-1, and another in support of its renewed motion to compel, ECF No. 46-4. Counsel agreed that the Court could consider Ms. Hartwell's earlier declarations when deciding the renewed motion to compel. May 2, 2025 Hr'g Tr. 4:18–5:2, ECF No. 54.

2019), 203 (June 2020), 262 (Dec. 2020). And, since 2006, the account agreement has contained an arbitration provision. Def.'s Mem. 7.

**2. The Kisers sign signature cards when they open several accounts at Truist.**

Truist requires customers to sign a signature card when opening an account. Harris Dep. 22:21–23, ECF No. 46-5. Although the record contains various signature cards, their structure and language are nearly identical. The top of the card identifies the account title and account number. *See, e.g.*, ECF No. 46-1, at 39. Then, there are lines for the account holder(s) to sign next to their typed name. *Id.* The following data boxes are below the signature(s): (a) date opened; (b) date revised (if any), and the reason for the revision; (c) "center number"; (d) "officer number"; (e) home and work phone numbers; (f) name of the Truist employee who opened the account; and (g) three check boxes to indicate whether the signature card is new, a replacement, or a change. *Id.* Directly below, the following language appears:

> SunTrust Bank ("Bank")
>
> It is agreed that all transactions between the Bank and the above signed shall be governed by the rules and regulations for this account and the above signed hereby acknowledge(s) receipt of such rules and regulations and the funds availability policy. The above signed also acknowledge(s) the funds availability policy has been explained.

*Id.* The card also has a "certification" section, which requires one account holder to sign and date indicating that the tax identification number provided is correct, there are no IRS backup withholdings, and the account holder is a United States citizen. *Id.* Lastly, there is a section for residents of various states (including Virginia) to elect the type of survivorship. *Id.*

Between 2005 and 2019, the Kisers opened more than a dozen accounts at Truist. Def.'s Interrogs. Resps. 6–7. The relevant accounts are summarized in the chart below, identifying the

accounts, the account type, who opened the account, the month and year the account was opened, and the version of the account agreement in effect when the account was opened:

| Account Number | Type | Opened by | Date Opened | Account Agreement Version |
|---|---|---|---|---|
| 5228 | personal | T. Kiser & R. Kiser | September 2011 | June 2010 |
| 8018 | personal | T. Kiser & R. Kiser | June 2012 | February 2012 |
| 4953 | personal | T. Kiser & R. Kiser | May 2015 | September 2014 |
| 8624 | personal | T. Kiser | August 2016 | June 2016 |
| 7058 | personal | T. Kiser & R. Kiser | July 2019 | June 2019 |

*Id.* at 5–7. The Kisers maintained their banking relationship with Truist until May 2021, when TIS terminated Mr. Kiser's employment and closed their personal and business accounts.[6] Am. Compl. ¶ 63.

Truist has submitted signature cards associated with opening these accounts. ECF No. 46-1, at 39 (5228 signature card), 40 (8018 signature card), 51 (7058 signature card), 52 (4953 signature card); ECF No. 46-3, at 42 (8624 signature card). The Kisers admit to signing the signature cards for the accounts ending in: (a) 5228, R. Kiser Dep. 45:7–46:8, ECF No. 46-1; T. Kiser Dep. 29:2–21, ECF No. 46-3; (b) 8018, R. Kiser Dep. 48:23–50:8; T. Kiser Dep. 30:21–31:22; and (c) 4953, R. Kiser Dep. 70:22–72:12; T. Kiser Dep. 62:16–63:1. Ms. Kiser also admits that she signed the signature card for the 8624 account. T. Kiser Dep. 32:9–33:16.

The Kisers maintain, however, that they did not sign the 7058 signature card, although signatures do appear next to their typed names. R. Kiser Dep. 54:4–6, 55:19–56:5, 56:18–24; T. Kiser Dep. 47:10–48:22; *see* ECF No. 46-1, at 51.

**C. The Kisers sue Truist, and Truist moves to compel arbitration.**

The Kisers sued Truist on July 15, 2024, ECF No. 1, and amended their complaint on October 4, 2024, Am. Compl., ECF No. 25. The Kisers assert five causes of action, all generally

[6] Ms. Kiser continues to maintain one business account with Truist. T. Kiser Dep. 10:2–15.

premised on Truist's alleged forgery of the Beach Time documents: (a) breach of contract (count one); (b) negligence (count two); (c) intentional infliction of emotional distress (count three); (d) tortious interference with business expectancy (count four); and (e) tortious interference with contractual relations (count five). Am. Compl. ¶¶ 145–246.

Truist first moved to compel arbitration on September 13, 2024. ECF No. 21. Along with opposing the motion to compel, ECF No. 30, the Kisers moved for discovery on the existence of an arbitration agreement, ECF No. 29. The Court held a hearing on, and granted, the Kisers' discovery motion and denied Truist's first motion to compel arbitration without prejudice on November 13, 2024. ECF Nos. 37–38.

After the parties completed limited discovery, Truist again moved to compel arbitration on March 3, 2025, ECF No. 45; Def.'s Mem., ECF No. 46. The Kisers opposed the renewed motion on March 10, 2025, Mem. of Law in Opp'n to Def.'s Renewed Mot. to Compel Arbitration, ECF No. 47 ("Pls.' Mem."), and Truist replied in support on March 14, 2025, Def.'s Reply in Further Supp. of Its Renewed Mot. to Compel Arbitration, ECF No. 48 ("Def.'s Reply"). On March 11, 2025—after Truist and the Kisers filed their principal briefs—the United States Court of Appeals for the Fourth Circuit issued a published opinion in *Johnson v. Continental Finance Co.*, 131 F.4th 169 (4th Cir. 2025). Given the timing of the parties' briefing and the *Johnson* ruling, the Court ordered supplemental briefing addressing *Johnson*'s effect, if any, on Truist's motion. ECF No. 49, at 1–2. On March 21, 2025, Truist (Def.'s Suppl. Br., ECF No. 50) and the Kisers (Pls.' Suppl. Br., ECF No. 51) filed supplemental briefs. The Court held a hearing on the motion on May 2, 2025, and took the matter under advisement.[7] ECF Nos. 53–54.

[7] At the hearing, Christopher Coss, Esq., and Bethany Fogerty, Esq., appeared on behalf of the Kisers, and Andrew Shapren, Esq., and Ethan Ostroff, Esq., appeared on behalf of Truist. Jodi Stewart was the official court reporter.

## II. LEGAL STANDARDS

### A. Motion to Compel Arbitration

A motion to compel arbitration "'exist[s] in the netherworld between a motion to dismiss and a motion for summary judgment,' and '[w]hether the motion should be treated as a motion to dismiss or a motion for summary judgment turns on whether the court must consider documents outside the pleadings.'" *Coady v. Nationwide Motor Sales Corp.*, No. 1:20cv1142, 2020 WL 6785352, at *3 (D. Md. Nov. 18, 2020) (quoting *PC Constr. Co. v. City of Salisbury*, 871 F. Supp. 2d 475, 477–78 (D. Md. 2012)), *aff'd*, 32 F.4th 288 (4th Cir. 2022); *see also Berkely Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 235 (4th Cir. 2019) ("To decide whether 'sufficient facts' support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test."). Because the parties rely on evidence from discovery outside the pleadings, such as deposition testimony and documents, the Court considers this evidence and applies the summary judgment standard. *See Samura v. SavaSeniorCare Admin. Servs., LLC*, No. 1:20cv2095, 2020 WL 6946587, at *2 (D. Md. Nov. 25, 2020).

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant meets its burden, the nonmoving party must then demonstrate with specific evidence a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *see also Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id.* The Court must view the facts and draw all inferences "in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587–88.

**B. The Federal Arbitration Act**

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA embodies "a liberal federal policy favoring arbitration agreements," and "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Through the FAA, Congress sought "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Rader v. Nw. Fed. Credit Union*, No. 1:23cv160, 2024 WL 388097, at *4 (E.D. Va. Feb. 1, 2024) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000)).

With that said, arbitrability is "strictly a matter of consent[,]" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit[,]" *AT&T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 648 (1986); *see also Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) ("It must be remembered that mandatory arbitration is not the default form of dispute resolution but rather is permitted only when the parties agree to it."). As the Fourth Circuit has observed, "the 'touchstones of arbitrability analysis' are the 'twin pillars' of the parties' 'consent and intent' to arbitrate[.]" *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 385–86 (4th Cir. 2013) (quoting *Peabody Holding Co. v. United Mine Workers of Am.*, 665 F.3d 96, 103 (4th Cir. 2012)).

If a party to an arbitration agreement sues in federal court, the opposing party can move to stay the proceedings and compel arbitration in the manner envisioned by the arbitration agreement. 9 U.S.C. §§ 3–4. The Court must compel arbitration under the FAA if: "(i) the parties have entered into a valid agreement to arbitrate, and (ii) the dispute in question falls within the scope of the arbitration agreement." *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015) (citing *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013)). Accordingly, a party can obtain an order compelling arbitration if she can demonstrate: (a) "the existence of a dispute between the parties"; (b) "a written agreement that includes an arbitration provision which purports to cover the dispute"; (c) "the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce"; and (d) "the failure, neglect or refusal of the defendant to arbitrate the dispute." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (quoting *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 n.6 (4th Cir. 2012)). Here, the parties do not dispute three of the four prerequisites to arbitration. A dispute exists between the parties (this lawsuit), the arbitration agreement evinces a transaction involving interstate commerce, and the Kisers have refused to arbitrate. Thus, the sole issue is whether a binding agreement to arbitrate this dispute exists.

As the party seeking to compel arbitration, Truist bears the burden of establishing that an arbitration agreement exists. *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 217 (4th Cir. 2024) (citing *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 456 (4th Cir. 2017)). Although questions of the scope of arbitrable issues should ordinarily be resolved in favor of arbitration, *Moses H. Cone*, 460 U.S. at 24–25, that presumption "does not apply to th[e] preliminary question of [an] [a]rbitration [a]greement's validity[,]" *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) (citing

*Granite Rock Co*, 561 U.S. at 302–03). Instead, the Court applies state law principles of contract formation when deciding whether the parties formed an agreement to arbitrate. *Marshall*, 112 F.4th at 218 (citation omitted). In Virginia,[8] "[t]he law of contracts governs the question whether there exists a valid and enforceable agreement to arbitrate." *Mission Residential, LLC v. Triple Net Props., LLC*, 654 S.E.2d 888, 890 (Va. 2008). Virginia law requires "the standard elements of offer, acceptance, and consideration for the formation of a valid contract." *Hill v. Alstom Power, Inc.*, No. 3:13cv496, 2013 WL 6408416, at *2 (E.D. Va. Dec. 6, 2013) (citation omitted).

## III. DISCUSSION

### A. It is for the Court, not an arbitrator, to determine whether there is an agreement between Truist and the Kisers to arbitrate this dispute.

To begin, the Court rejects Truist's argument that the account agreement delegates the determination of the validity or enforceability of the arbitration agreement to an arbitrator. Def.'s Mem. 33–34. Although Truist is correct that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010), "[t]o place such power in an arbitrator's hands, the parties must agree, in 'clear and unmistakable' language, that an arbitrator will decide which disputes the parties have agreed to arbitrate[,]" *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 265 (4th Cir. 2019) (quoting *Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999)). This "clear and unmistakable" standard is "exacting." *Id.*

Truist relies on language in the June 2019 and December 2020 versions of the account agreement defining what "claims" are excluded from the arbitration provision. Def.'s Mem. 33–34 (citing ECF No. 46-4, at 290). It provides:

> **Excluded Claim or Proceeding.** Notwithstanding the foregoing, "Claim" does not include any dispute or controversy about *the validity, enforceability, coverage*

[8] The parties agree that Virginia law governs whether they formed an agreement to arbitrate. May 2, 2025 H'rg Tr. 5:3–8, ECF No. 54.

> *or scope of this arbitration agreement* or any part thereof . . . all such disputes or controversies are *for a court and not an arbitrator to decide*. However, any dispute or controversy that concerns the validity or enforceability of the *rules and regulations as a whole is for the arbitrator, not a court to decide.*

ECF No. 46-4, at 290 (emphasis added). The plain language of this provision makes clear that whether there is an agreement to arbitrate between Truist and the Kisers is for the Court to decide. The Court proceeds to do just that.

**B. Truist's contentions regarding the applicable version of the account agreement that governs the Kisers' agreement to arbitrate disputes.**

Ordinarily, when ruling on a motion to compel arbitration, the Court begins by summarizing provisions of the alleged operative arbitration agreement. The Court cannot do so here because Truist has taken a "kitchen sink" approach. Truist submitted no fewer than eight versions of the account agreement (totaling more than 400 pages) in support of its motion to compel arbitration and then, in essence, said: "The Kisers agreed to arbitrate this dispute at some point under the terms of one of these agreements."

In its brief, Truist quotes the June 2019 version of the account agreement ("2019 account agreement") when it discusses the terms of the arbitration agreement, Def.'s Mem. 13–19; Def.'s Reply 16, but also cites in footnotes provisions from four other versions that it contends "contain similar language[,]" *e.g.*, Def.'s Mem. 13 n.20, 14 n.21. One would think then that the 2019 account agreement was the operative agreement. But after exhaustively combing through the arbitration provision in the 2019 account agreement, Truist throws the wrench: the Kisers *also* agreed to the terms of the December 2020 version of the account agreement ("2020 account agreement"). *Id.* at 18; *see also id.* at 29–30. According to Truist, "[t]he relevant provisions of the [2020 account agreement] are substantially similar to the [2019 account agreement.]" *Id.* at 18–19. And enter the kitchen sink. If the Kisers did not agree to the 2020 account agreement,

then Truist argues that "they agreed to the terms of the [r]ules and [r]egulations then in effect at the time they opened each of their numerous accounts with Truist . . . including the six accounts listed above." *Id.* at 30. So, "it is clear that the Kisers agreed to the terms of the [a]rbitration agreement[s], which are valid and enforceable against the Kisers." *Id.* Only in response to the Court's hearing inquiry about the operative agreement did Truist make clear its position: the 2020 account agreement is the operative agreement. May 2, 2025 Hearing Transcript 6:22–24, ECF No. 54 ("Hr'g Tr."). If this is so, a few observations are in order.

Truist consistently says that the 2020 account agreement is "substantially similar" to the 2019 version. *See, e.g.*, Def.'s Mem. 19. It is not. For example, Truist devotes an entire page of its brief quoting a clause from the arbitration provision in the 2019 account agreement that allows a customer to reject arbitration, *id.* at 17, and then buries in a footnote that the 2020 account agreement "does not contain an opportunity to reject" arbitration. *Id.* at 19 n.30. Then, Truist places much significance that "[p]rior to June 2020, the [r]ules and [r]egulations also provided the Kisers with an opportunity to reject the [a]rbitration [a]greement contained therein[,]" and the Kisers did not do so. *Id.* at 28. But if the 2020 account agreement is operative, which *does not* contain an opt-out provision, why is this necessary or relevant? At times, it appears Truist cherry-picked provisions from each of the agreements to advance different arguments.

Truist quotes the 2019 account agreement's definition of a "claim" that is subject to arbitration and specifies (and emphasizes) that the definition "applies not only to specific accounts and transactions, but more broadly to 'our relationship,' i.e., the relationship between the Kisers and Truist." *Id.* at 14 (citing ECF No. 22-1, at 36). In a footnote after the citation of the definition, Truist says that the arbitration provisions "in the other relevant versions" of the account agreement "contain similar language" and then cites to those versions. *Id.* at 14 n.21. But the Court does not

see how those earlier versions "contain similar language" when the June 2019 account agreement is the first to define "claim" to include "our relationship." *Compare* ECF No. 46-4, at 17 (June 2010), *with* ECF No. 22-1, at 36 (June 2019). More troubling is Truist's extensive reliance on "our relationship" when it argues that this dispute falls within the scope of the arbitration agreement. Def.'s Mem. 31–33; *see, e.g.*, *id.* at 33 ("The Kisers' claims fall within the scope of this expansive agreement to arbitrate as they arise out of and relate to the Kisers' and their entities Truist Bank accounts *and the broader relationship between the Kisers and Truist*[.]" (emphasis added)). Truist does not rectify this until its reply, stating that the "'our relationship' language was not in prior versions . . . [but those] versions are also broad[.]" Def.'s Reply 22.

* * *

Truist argues that the Kisers agreed to arbitrate this dispute by agreeing to the 2020 account agreement. For the reasons discussed below, the Court rejects this argument. As a fallback, Truist contends that the Kisers agreed to arbitrate this dispute by assenting to an earlier version of the account agreement. The Court agrees and starts there.

### C. Mr. Kiser and Ms. Kiser received the 2014 and 2016 account agreements, respectively, and agreed to be bound by the terms therein, including the arbitration provisions.

Truist points to the most recent signature card the Kisers admit to signing to prove they received the then-in-effect version of the account agreement. Def.'s Mem. 30. As discussed below, there is a genuine dispute of material fact whether the Kisers signed the 7058 signature card. Both Kisers, however, testified that they signed signature cards associated with other accounts that they opened,[9] the most recent of which is, for: (a) Mr. Kiser, the 4953 card signed

[9] Apart from the signature cards discussed above, the Kisers testified that they signed the cards for the joint personal accounts ending in: (a) 5228 opened in October 2011, R. Kiser Dep. 45:7–46:8;

in May 2015, ECF No. 46-1, at 52, which was governed by the September 2014 version of the account agreement ("2014 account agreement"), Hartwell Suppl. Decl. ¶ 4; and (b) Ms. Kiser, the 8624 card[10] signed in August 2016, ECF No. 46-3, at 42, which was governed by the June 2016 version of the account agreement ("2016 account agreement"),[11] Hartwell Suppl. Decl. ¶ 5. Both signature cards have the following language below the signature lines:

> It is agreed that all transactions between the Bank and the above signed shall be governed by the rules and regulations for this account and ***the above signed hereby acknowledge(s) receipt of such rules and regulations***[.]

ECF No. 46-1, at 52 (4953); ECF No. 46-3, at 42 (8624) (emphasis added).

By signing the signature cards, the Kisers agreed that the account agreement governs "transactions" between Truist and them and they received the then-in-effect account agreement. *See Fleming v. Bank of Va.*, 343 S.E.2d 341, 344 (Va. 1986) ("The signature card constituted the contract between the parties and . . . regulates their rights and duties." (citing *Colley v. Cox*, 167 S.E.2d 317, 319 (Va. 1969))); *see also Gillam v. Branch Banking & Tr. Co. of Va.*, No. 3:17cv722,

---

T. Kiser Dep. 29:2–21; and (b) 8018 opened in October 2012, R. Kiser Dep. 48:23–49:50:8; T. Kiser Dep. 30:21–31:22.

[10] Ms. Kiser points out that the section on the 8624 signature card titled "For residents of Arkansas, Maryland, North Carolina, Virginia, and Washington D.C. only" is blank and has no signature. Pls.' Mem. 11–12 (citing ECF No. 46-3, at 40, 42). She also notes that she lived in Virginia in August 2016, "and this section should have been completed and signed" on the 8624 signature card. *Id.* at 12. To the extent Ms. Kiser argues that the signature on the 8624 card is not hers, the Court disagrees, given her deposition testimony to the contrary. T. Kiser Dep. 32:9–33:16.

[11] Truist also puts forth a signature card for "a Beach Time entity" account ending in 5907, opened in September 2019, and signed by Ms. Kiser. Def.'s Mem. 7; ECF No. 46-3, at 103. That signature card makes clear that it binds only the entity. ECF No. 46-3, at 103 ("It is agreed that all transactions between the Bank and *the entity listed in the above Account Title* . . . shall be governed by the rules and regulations for this account[.]" (emphasis added)). The relevant question is whether Ms. Kiser, not Beach Time, entered an agreement to arbitrate with Truist.

2018 WL 3744019, at *3 (E.D. Va. Aug. 7, 2018) ("Virginia recognizes the use of signature cards as a valid means of agreeing to a contract." (citations omitted)).

The 2014 and 2016 account agreements provide:

> Once the Account *is opened*,[12] *you agree to be bound* by these rules and regulations and that the rules and regulations will continue to govern your Account and your relationship with us even after your Account is closed.
> . . .
> By *continuing to maintain your Account*, *you agree to be bound by* and to follow these terms in *any and all future actions **and*** transactions.

ECF No. 46-4, at 56 (2014), 113 (2016) (emphasis added). It is undisputed that the Kisers *opened* the 4953 account and Ms. Kiser opened the 8624 account. Def.'s Interrogs. Resps. 6–7; R. Kiser Dep. 71:1–24; T. Kiser Dep. 32:9–33:16. Opening the accounts—an action explicitly recognized in the account agreement as sufficient to manifest acceptance—was sufficient for the Kisers to "agree to be bound by these rules and regulations" including the arbitration provision contained therein.[13] *See Klein v. Verizon Commc'ns, Inc.*, No. 1:12cv757, 2017 WL 5071306, at *4 (E.D. Va. Aug. 9, 2017) (citing *In re Frye*, 216 B.R. 166, 171 (E.D. Va. 1997)).

The Kisers insist they did not agree to the account agreement referenced in the signature cards because they never received the account agreement. Pls.' Mem. 12–15. This argument directly contradicts the language on the signature card, which states that the "above signed"—that is, the Kisers—acknowledge that they received "such rules and regulations." ECF No. 46-1, at 52.

---

[12] The 2014 and 2016 account agreements provide: "The Account is deemed 'opened' when Account documentation has been properly completed and accepted by the Bank and the opening deposit has been accepted by the Bank. An additional Account opened for an existing Depositor will be deemed 'opened' when the opening deposit has been accepted by the Bank." ECF No. 46-4, at 58, 114

[13] The Court rejects the Kisers' argument that they agreed only that the rules and regulations would govern transactions. Pls.' Mem. 24–26. The signature card is only evidence that the Kisers received the rules and regulations; it does not define the scope of any agreement.

The agreement could not be clearer—by signing the card, the Kisers acknowledged that they received the account agreement. Therefore, the Court can only conclude that they received the same.

The Kisers' reliance on *Wright v. Branch Banking & Trust Co.*, No. 1:08-0121, 2008 WL 11380008, at *1 (S.D.W. Va. Sept. 26, 2008) is misplaced. Pls.' Mem. 15. There, the *only* evidence that a bank offered when it moved to compel arbitration was a signature card and the service agreement that contained an arbitration provision. 2008 WL 11380008, at *1. The court found that the bank did not offer evidence that the customer received the service agreement. *Id.* *2. But there is one key distinction that the Kisers fail to recognize. In *Wright*, the signature card stated that the signatory only "agree(s)" to the service agreement. *Id.* at *1. But here both signature cards state that the signatory agrees that the account agreement will govern the account ***and*** the Kisers "acknowledge(s) ***receipt*** of [the account agreement.]" ECF No. 46-1, at 52; ECF No. 46-3, at 42 (emphasis added). This distinction renders *Wright* inapposite on this point.

As much as the Kisers argue that the signature cards insufficiently incorporated the account agreement by reference, the Court disagrees. Pls.' Mem. 15–16. They point out that the "Deposit Account Resolution and Authorization for Business Entities"[14] form that Ms. Kiser completed for Beach Time in September 2019 states that the "Business Entity is bound by the terms and conditions of the Bank's Rules and Regulations for Deposit Accounts[.]" *Id.* at 15–16, 25 (quoting ECF No. 46-3, at 99). This reference, according to the Kisers, contrasts with the signature card's

[14] The "Deposit Account Resolution and Authorization for Business Entities" form applied to all accounts in a business' name then-opened or opened in the future. ECF No. 46-3, at 99. It appears that the form identifies a custodian of records and the person(s) with authority to sign on a business' behalf. *Id.*

"amorphous reference to 'rules and regulations[.]'"[15] *Id.* at 16. But Truist relies on the signature cards only to prove that the Kisers received the rules and regulations.

In Virginia, parties can incorporate separate documents into a contract by reference. *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012) (holding that references to regulations in a deed—which is governed by the law of contracts—were sufficient to incorporate the regulations as terms of the deed); *High Knob Assocs. v. Douglas*, 457 S.E.2d 349, 354–55 (Va. 1995) (holding that language showing that a party acknowledged that he received, read, and understood an otherwise extrinsic document before executing a contract was sufficient to incorporate that document into the contract). In *Marriott v. Harris*, a land sales contract stated that the "[p]urchaser . . . hereby acknowledges receipt of a property report prepared pursuant to the Interstate Land Sales Full Disclosure Act[.]" 368 S.E.2d 225, 232 (Va. 1988). The Supreme Court of Virginia held that the contract incorporated that report by reference, and the report became part of the contract, even though the contract did not refer to the report by name. *Id.* at 232–33.

Such is the case here. The signature cards state that the signatory agrees that transactions are governed by "the rules and regulations *for this account*" and acknowledges "receipt of *such* rules and regulations[.]" ECF No. 46-1, at 52 (emphasis added). The signature card could more clearly identify the rules and regulations. But simply because it *could be clearer* does not mean that it is not clear enough, especially considering that the Kisers signed the signature cards

---

[15] The Court notes that the language here is like that of the signature card in *Fleming*:

> All accounts requested above shall be subject to, and the above signed will be bound by, the applicable RULES AND REGULATIONS governing such accounts, in effect on this date and as modified from time to time by the issuing bank. Receipt of RULES AND REGULATIONS applicable to accounts requested above is hereby acknowledged.

343 S.E.2d at 342–43.

indicating that they received the account agreements. If they did not, they should not have signed the signature card acknowledging that they did. Any failure to read the signature card does not invalidate assent to its contents. *See Camacho v. Holiday Homes, Inc.*, 167 F. Supp. 2d 892, 896 (W.D. Va. 2001) ("It is well settled that a party to a written contract is responsible for 'inform[ing] himself of its contents before executing it, . . . and in the absence of fraud or overreaching he will not be allowed to impeach the effect of the instrument by showing that he was ignorant of its contents or failed to read it.'" (quoting *Corbett v. Bonney*, 121 S.E.2d 476, 480 (Va. 1961))).

Lastly, the Kisers argue that the signature cards did not put them on notice that they agreed to arbitrate disputes with Truist. Pls.' Mem. 15–17. To prove an arbitration agreement exists, Truist must prove that the Kisers: (a) "had 'reasonable notice of an offer' to enter into the contract" and (b) "'manifested' assent to it." *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 389 (4th Cir. 2024) (quoting *Marshall*, 112 F.4th at 218). "Offers and terms that are made reasonably conspicuous generally will satisfy this standard." *Marshall*, 112 F.4th at 219 (internal quotations and citations omitted). Even a cursory scan of the first page of the account agreement, or the table of contents on the next, puts the average consumer on inquiry notice of the existence and implications of the arbitration agreement. The first page of both the 2014 and 2016 account agreements states that by continuing to maintain their accounts, the Kisers "agree[d] to be bound by and to follow *these* terms in any and all future actions and transactions." ECF No. 46-4, at 56, 113 (emphasis added). The bottom of that page contains a notice of the arbitration agreement :

> **PLEASE REVIEW THE ARBITRATION AGREEMENT IN ITS ENTIRETY WHICH BEGINS ON PAGE 25 [24] OF THESE RULES AND REGULATIONS.**

*Id.* And the table of contents for each lists "arbitration agreement," "jury trial waiver," and "class action waiver" bolded, setting those provisions apart from others that are in plain typeface.

*Id.* at 57, 113. These provisions gave the Kisers reasonable notice of the arbitration agreement. *See, e.g.*, *Hall v. State Emps. Credit Union of Md.*, No. 1:23cv2885, 2025 WL 903850, at *4–5 (D. Md. Mar. 25, 2025) (finding an agreement that "prominently indicates on its first page, in bolded all-capital letters, that it includes an arbitration agreement" gave the plaintiff "reasonable notice of the arbitration agreement").

* * *

Mr. Kiser and Mrs. Kiser agreed to the 2014 and 2016 account agreements, respectively, and the arbitration provisions therein.

**D. The Court cannot conclude that the Kisers agreed to the 2020 account agreement.**

Truist seeks to compel arbitration under the arbitration provision in the 2020 account agreement and, to do so, it must prove that the parties "formed the operative arbitration agreement it contends applies." *Kyre v. Experian Info. Sols., Inc.*, No. 1:24cv273, 2025 WL 1549895, at *8 (M.D.N.C. May 30, 2025). A two-step analysis is required to conclude that the Kisers agreed to the 2020 account agreement. At step one, Truist argues that the Kisers agreed to the 2019 account agreement by opening the 7058 account and receiving the 2019 account agreement, because that agreement provides that "[b]y *opening* the Account, you agree to be bound by these rules and regulations[.]" ECF No. 22-1, at 9. Truist offers two avenues to prove that the Kisers received the 2019 account agreement: signing the 7058 signature card ("step 1(a)") or simply opening the 7058 account ("step 1(b)").

Moving to step two, Truist argues that the Kisers agreed to the 2020 account agreement because: (a) the 2019 account agreement provides that Truist can modify the terms and that "[b]y continuing to maintain your Account, you [the Kisers] agree to be bound by and to follow these terms in any and all future actions and transactions[,]" ECF No. 22-1, at 9; (b) the Kisers received

notice of the 2020 account agreement in a December 29, 2020 statement for the 7058 account, R. Kiser Dep. 82:12–83:8; T. Kiser Dep. 86:4–14; and (c) the Kisers maintained the account until Truist closed it in 2021, R. Kiser Dep. 82:24–83:8; T. Kiser Dep. 86:15–22. Def.'s Mem. 10.

Truist's argument fails at step one. For step 1(a), there are genuine disputes of material fact whether the Kisers signed the 7058 signature card. Likewise, at step 1(b), there are genuine disputes of material fact whether the Kisers received a copy of the 2019 account agreement in the ordinary course of business by simply opening the 7058 account. Thus, Truist has not carried its burden to prove that the Kisers received the 2019 account agreement. Regardless of whether the Kisers received and agreed to the 2019 account agreement, Truist's argument also fails at step two. Although the agreement provides that Truist can modify its terms, and even if the Kisers received notice of the same, neither the agreement nor the notice provides that the Kisers agree to subsequent modifications simply by continuing to maintain their account.

**1. Step 1: Truist has not proven that the Kisers received the 2019 account agreement.**

**a. Step 1(a): Did the Kisers acknowledge receipt of the 2019 account agreement by signing the 7058 signature card?**

Truist submitted the signature card that it contends the Kisers signed when they opened the 7058 account in 2019. ECF No. 46-1, at 51. Like the 4953 and 8624 signature cards, if the Kisers signed the 7058 signature card, then they also acknowledged receipt of the 2019 account agreement. Along with the signature card, Truist cites the testimony of Melissa Harris, that Truist required a signature card to open a new account. Harris Dep. 22:21–23, ECF No. 46-5. In other words, Truist would not have opened the 7058 account if the Kisers did not sign the signature card and, because it opened the account, the Kisers must have signed the 7058 signature card. *See* Def.'s Reply 12 n.6.

But the Kisers testified that the signatures on the 7058 signature card are *not* their signatures. R. Kiser Dep. 55:19–56:5, 56:18–24; T. Kiser Dep. 48:4–22. They also point out some corroborating portions of Ms. Harris' testimony: (a) although the signature card reflects that she created the card, the "officer number" and work phone number listed were not hers, Harris Dep. 17:12–17, ECF No. 47-1; (b) she did not recall preparing the form, *id.* at 27:18–20; (c) she has never met Ms. Kiser, *id.* at 11:22–23; and (d) she did not witness the signatures and "do[es] not know who signed [the card,]" *id.* at 30:5–6.

Beyond arguing that the Kisers are "simply not credible" in denying that they signed the 7058 signature card, Def.'s Mem. 10 n.13, Truist engaged Khody R. Detwiler, a forensic document examiner, to compare the signatures on the card with known exemplars of the Kisers' signatures produced in discovery.[16] ECF No. 46-6. Below are the signatures on the disputed 7058 signature card and a sample of the known signatures on which Mr. Detwiler relied.

**The Disputed 7058 Signature Card**[17]

| Authorized Signature(s) | |
|---|---|
| Verification/Tax ID Number | Principal Signature |
| 1. ███ / RONALD G KISER | [signature] |
| 2 ███ / TARAH KISER | [signature] |

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Signature of U.S. Person [signature] Date 7/9/19

**For residents of Arkansas, Maryland, North Carolina, Virginia, and Washington D.C. only**

**Selection of Type of Survivorship.** Joint accounts can be either with or without survivorship. "With Survivorship" means that if one owner dies, the surviving owner(s) become the sole owner of the account. "Without Survivorship" means that if one owner dies, the surviving owner and the decedent's estate own the account. Refer to the Rules and Regulations for Deposit Accounts for additional information.

Choose One. ☒ With Survivorship ☐ Without Survivorship

Signature [signature] Signature [signature]

- **Locations with DCOR scanning software submit with cover sheet via local scanner**

---

[16] Mr. Detwiler received 611 documents containing 626 signatures attributed to Ms. Kiser and 31 documents containing 36 signatures attributed to Mr. Kiser. ECF No. 46-6, at 4, 8.

[17] ECF No. 46-1, at 51.

**Known Signature Samples**[18]







Based on the comparison, Mr. Detwiler opined that there is a "strong probability" that the Kisers "wrote" the disputed signature on the 7058 signature card. *Id.* at 10.

It is not for the Court, however, "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 246. The Kisers steadfastly maintain that they did not sign the 7058 signature card. To credit Mr. Detwiler's expert opinion over the Kisers' testimony would require the Court to weigh the evidence in Truist's favor. That the Court cannot do. *Id.* at 255. For similar reasons, the Court declines Truist's invitation to evaluate the Kisers' credibility. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d

[18] ECF No. 46-6, at 27–28.

562, 569 (4th Cir. 2015) (holding that it is not appropriate to make credibility determinations at the summary judgment stage). Mr. Detwiler's opinion does no more than raise a genuine dispute of material fact as to whether the Kisers signed the 7058 signature card. *Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc.*, No. 01 Civ. 4788, 2006 WL 587483, at *19 (S.D.N.Y. Mar. 8, 2006); *Kluge v. Fugazy*, 739 F. Supp. 939, 939–40 (S.D.N.Y. 1990).

**b. Step 1(b): Did the Kisers receive the 2019 account agreement in the ordinary course of business when they opened the 7058 account?**

Truist argues that, in the ordinary course of business, the Kisers received a copy of the 2019 account agreement when they opened the 7058 account in July 2019. Def.'s Reply. 7. Truist submits three declarations from Lori Hartwell, the Operations Manager for the Virginia East and Virginia West Regions. Hartwell Decl. ¶ 1, ECF No. 22-1; Hartwell First Suppl. Decl., ECF No. 31-1; Hartwell Suppl. Decl., ECF No. 46-4. Ms. Hartwell states that, in July 2019, "ordinary business practices for Truist . . . required . . . that the version of the bank servicing agreement then in effect be provided to the depositor upon the opening of a new account[.]" Hartwell First Suppl. Decl. ¶ 5; *see also* Def.'s Mem. 26. She also states that she is "familiar" with Truist's "procedures for opening a new account that were applicable in 2019[,]" and attaches a document titled "Deposit Account: Opening a New Personal Account – Branch" that provided "Branch Teammates steps to assist in opening a new personal account." Hartwell Suppl. Decl. ¶ 8 (citing ECF No. 46-4, at 319). Truist argues that the document "confirms that customers opening accounts were to receive a 'Welcome Kit,' including a copy of the [r]ules and [r]egulations." Def.'s Reply 7 (first citing Hartwell Suppl. Decl. ¶ 8; and then citing ECF No. 46-4, at 319–53). Moreover, Ms. Hartwell testified that Truist's ordinary business practices required a customer to come in person to a branch to open an account. Hartwell Dep. 40:19–41:4, ECF No. 47-3.

Because the 2019 account agreement provides that "[b]y *opening* the Account, you agree to be bound by these rules and regulations[,]" ECF No. 46-4, at 142 (emphasis added), and the Kisers do not dispute that they *opened* the 7058 account in July 2019, T. Kiser Dep. 45:3–46:18, 49:1–4; R. Kiser Dep. 50:17–51:8, 58:18–59:10, Truist argues that they engaged in conduct that the agreement recognizes as sufficient to accept its terms. Def.'s Mem. 27 (citing *Klein*, 2017 WL 5071306, at *4). And, according to Truist, by agreeing to the 2019 account agreement, ECF No. 22-1, at 7–66, the Kisers also agreed to the arbitration provision contained therein, *id.* at 36–40.

Truist argues that the Kisers have not "unequivocally denied having received" the account agreement in their depositions, while they did in their previously submitted declarations. Def.'s Mem. 9. Mr. Kiser testified that "it's possible" that at one time he received the account agreement, but he did not receive any documentation from Truist when he opened the 7058 account. R. Kiser Dep. 16:9–11, 78:11–79:2. When asked whether she received the account agreement for "this account," Ms. Kiser testified: "I remember receiving a folder that had the rules in it for - - well, the guidelines, rules, whatever it was, for my accounts; and it had like the starter checks in case you needed to write a check when you were waiting for your checks to come in." T. Kiser Dep. 19:16–23. Neither Truist nor the Kisers submitted the entirety of Ms. Kiser's deposition transcript, so the Court identify the account to which "this account" refers.[19] When Ms. Kiser was asked if she was ever given a copy of the 2019 or 2020 account agreement, she testified "not to my knowledge" and "no," respectively. *Id.* at 81:9–23. Lastly, Truist cites the following exchange from her deposition:

[19] Immediately preceding this is a discussion about Ms. Kiser opening accounts with "Karalee." T. Kiser Dep. 19:1–6. The Kisers submitted an affidavit from "Karalee Hale Fehrn." ECF No. 47-4. In its reply, Truist says that "Ms. Hale last worked for the Bank in 2008[.]" Def.'s Reply 11. This context suggests that Ms. Kiser's answer did not relate to the 7058 account.

> [Q]: Have you ever read any version of the rules and regulations for deposit accounts at SunTrust or Truist?
>
> [A]: Not in a long time.
>
> [Q]: Okay. At some point you did?
>
> [A]: I don't remember. Probably *initially* I would have glanced through them, but not since then.

T. Kiser Dep. 34:17–24 (emphasis added). Viewing this "in a light most favorable to the nonmovant" and "drawing all justifiable inferences in that party's favor," *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 299 (E.D. Va. 2019) (citation omitted), this statement is a possible admission that Ms. Kiser read the account agreement "initially"—when she "initially" opened her accounts with Truist as early as 2005, at a time when there was no arbitration provision therein.

In declarations opposing Truist's first motion to compel arbitration,[20] the Kisers swore under penalty of perjury that they had "never seen the 'Rules and Regulations for Deposit Accounts' submitted by Truist as part of its motion." ECF No. 30-1 ¶ 15; ECF No. 30-2 ¶ 14. Truist contends that the Kisers stated in the declarations that "they 'have never seen' the [r]ules and [r]egulations." Def.'s Mem. 9 n.12. Truist, however, left off the end of the Kisers' statements: they "have never seen the 'Rules and Regulations for Deposit Accounts' *submitted by Truist as*

---

[20] At the motions hearing, counsel agreed that the Court could consider the exhibits from the parties' briefing on Truist's first motion to compel arbitration:

> [THE COURT]: Is there any objection to the Court's consideration *of the exhibits from the initial motion* [to compel arbitration] *in conjunction with the renewed motion*[?]
>
> . . .
>
> [MR. COSS]: No objection, Your Honor.
>
> . . .
>
> [MR. SHARPEN]: No, Your Honor.

Hr'g Tr. 4:18–5:2 (emphasis added); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

*part of its motion*." ECF No. 30-1 ¶ 15 (emphasis added); ECF No. 30-2 ¶ 14. Truist referenced and submitted *only* the 2019 and 2020 account agreements in its first motion to compel arbitration. *See, e.g.*, ECF No. 22, at 4–9. The Kisers' deposition testimony does not contradict these statements.

Lastly, the context of the opening of the 7058 account is instructive. Mr. Kiser testified that, as a financial advisor at TIS, he came to know Melissa Harris, the manager of the Cheriton SunTrust branch on the Eastern Shore of Virginia. R. Kiser Dep. 12:14–13:10. After receiving a bonus in 2019, Mr. Kiser called Ms. Harris and asked her to open an account in the Kisers' names and transfer some of the bonus there, to which Ms. Harris responded, "No problem. I'll take care of it." *Id.* at 14:1–16, 16:20–21, 58:18–59:10. Mr. Kiser testified that he did not sign anything related to the 7058 account and, a few days later, Ms. Harris called him and said, "Hey, it's all done." *Id.* at 17:15–16. Truist has offered no evidence to raise a genuine dispute of fact as to whether Mr. Kiser opened the 7058 account over the phone. This is consistent with Ms. Harris' testimony that she was permitted to open an account over the phone "if you knew the customer," Harris Dep. 21:20–22, ECF No. 47-1, and the account agreement would be mailed to a customer who did so, Harris Dep. 24:1–9, ECF No. 48-1. There is, however, no evidence that Ms. Harris mailed the account agreement to the Kisers. And Ms. Hartwell, Truist's Rule 30(b)(6) designee, testified that a customer was required to come to a branch to open an account at Truist in 2019. Hartwell Dep. 40:19–41:4. This is even more reason to question whether Truist's reliance on its ordinary course of business is appropriate when faced with contrary evidence given that the 7058 account was opened outside the "ordinary" course.

A genuine dispute of material fact exists as to whether the Kisers received and agreed to the 2019 account agreement simply by opening the 7058 account.[21]

**2. Step 2: Assuming the Kisers received the 2019 account agreement, did they agree to the 2020 account agreement by receiving notice of the modification and continuing to maintain their account?**

Truist argues that the Kisers agreed to the 2020 account agreement by continuing to maintain their accounts after receiving notice of modifications to the account agreement—that is, notice of the 2020 account agreement—on their account statements. Def.'s Mem. 29. The record contains a statement for the 9282 account, dated January 15, 2021,[22] the first page of which contains the following notice of the December 2020 changes to the account agreement:

> [A]s of December 1, 2020, changes will be made to the Rules and Regulations for Deposit Accounts. The changes will be reflected in the 12/2020 version. The Rules and Regulations for Deposit Accounts and the updated Funds Availability Policy can be viewed or obtained online at www.suntrust.com/disclosures, by requesting a copy at 800.SUNTRUST, or by visiting a SunTrust branch.

ECF No. 46-1, at 70. Thus, Truist argues that the Kisers agreed to the 2020 account agreement because the 2019 account agreement provides that Truist can modify the terms "and that continuing to maintain an account constitutes agreement" to any modification. Def.'s Mem. 29.

The Kisers disagree, pointing out that, in *Gillam* and *Klein*—two cases cited by Truist—the *notices* of the modifications to the initial agreements stated that continued use after the notice

---

[21] As much as Truist argues that the Kisers received other versions of the rules and regulations simply by opening other accounts, the evidence does not support such a broad conclusion. Ms. Hartwell's declaration provides only that she is familiar with Truist's "procedures and ordinary business practices for opening a new account that were *applicable in 2019*." Hartwell Suppl. Decl. ¶ 8 (emphasis added). She also includes an internal document as an exhibit to her declaration to support the same, and that document "was in effect in July 2019." *Id.* There is insufficient evidence in the record concerning Truist's business practices at other times.

[22] Truist also states that the Kisers received the same notice on their account statement, dated July 15, 2021, for their account ending in 9282. Def.'s Mem. 12; *see* ECF No. 46-1, at 70.

constituted acceptance of the modified terms. Pls.' Mem. 17. According to Truist, however, the inquiry was not the content of the notice, but "the fact that the *initial* agreements contained terms providing that continued use would bind parties to modified contract terms." Def.'s Reply 14 (emphasis added).

In Virginia, although silence cannot alone be sufficient to manifest acceptance of a contract, a party can demonstrate acceptance through some other "objective manifestation of assent." *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010) (citing *Phillips v. Mazyck*, 643 S.E.2d 172, 176 (Va. 2007)). Thus, "[a]ssent may be inferred from the acts and conduct of the parties." *Durham v. Nat'l Pool Equip. Co. of Va.*, 138 S.E.2d 55, 58 (Va. 1964). And "[i]t is well settled that manifesting acceptance by engaging in activity explicitly recognized as such in the governing contract provisions is sufficient to demonstrate assent under Virginia law." *Klein*, 2017 WL 5071306, at *4 (citing *In re Frye*, 216 B.R. at 171).

In *Klein*, Verizon's terms of service agreement (which contained an arbitration provision) provided that Verizon could change the agreement, Verizon would provide notice of any changes on its website or by sending an email, any changes would be effective as of the date noted on the website posting or on which it sent the email, and after those revisions become effective, continued use of Verizon's services equated to "accept[ing] and agree[ing] to abide" by those changes. *Id.* at *2. The modification notice provided: "By continuing to use the services after the date of this notice, you accept and agree to abide by the revised terms." *Id.* This Court found that the plaintiff "sufficiently assented to the modifi[ed agreement], including the arbitration clause, because the *previous agreement* between the parties allowed for contract modification via an email from Verizon and [the plaintiff]'s continued use of Verizon's services." *Id.* at *4 (emphasis added).

Similarly, in *Gillam*, when the plaintiffs opened a bank account with the defendant, they received a "Welcome Letter" with a copy of the defendant's "Bank Services Agreement." 2018 WL 3744019, at *1. That agreement provided that the defendant could modify it with written notice and "[c]ontinued use of the account following notice of amendment constitutes acceptance of any amendment to this Agreement." *Id.* Fifteen years later, the plaintiffs received a notice that the agreement was modified, "continued use of the account constituted acceptance of the changes," and the amended agreement was available online. *Id.* This Court found that the plaintiffs agreed to the modifications because the *initial* agreement provided that the defendant could modify its terms with notice, the defendant provided notice when it modified the terms, and that notice "reminded [the plaintiffs] that continued use of their bank accounts would constitute acceptance of the additional terms[.]" *Id.* at *3. Thus, by continuing to use their accounts, this Court concluded that the plaintiffs agreed to the modified agreement. *Id.*

Here, the notice on the Kisers' account statement *does not* provide that continued maintenance of an account constitutes manifesting acceptance of the modifications. Still, the Court agrees with Truist that, in *Klein* and *Gillam*, this Court focused on the initial agreement and not the content of the subsequent modification notice. But the Court does not see how refining this focus strengthens Truist's position. The introductory language in the 2019 agreement provides:

> All Accounts are subject to **these** rules and regulations, related account agreements and/or authorizing documents executed by the Depositor. By *opening the Account, you agree to be bound by these rules and regulations and that the rules and regulations will continue to govern your Account and your relationship with us even after your Account is closed.* . . .
>
> When the laws governing your Account require the Bank to provide you written advance notification of a change to the rules and regulations, the Bank will provide such notice through a letter, account statement message or other written or electronic notice. *Unless otherwise prohibited or required by applicable law or regulation, the Bank may change from time to time other provisions of* ***these*** *rules and regulations with or without notice.*

> When **<u>these</u>** rules and regulations change, a copy of ***<u>the revised</u>*** *rules and regulations* will be available at any office of the Bank or on the Bank's website at www.suntrust.com/rulesandregulations. . . .
>
> . . .
>
> **<u>These</u>** rules and regulations constitute a contract and agreement between you and the Bank. *This current version* of **<u>these</u>** rules and regulations supersedes all prior versions, discussions and agreements and contains the terms governing your Account. *By continuing to maintain your Account, you agree to be bound by and to follow* ***<u>these</u>*** *terms in any and all future actions and transactions.* **<u>These</u>** rules and regulations cannot be changed or modified orally.

ECF No. 22-1, at 9 (emphasis added).

Truist argues that two of these provisions support its position that "the *initial* agreements contained terms providing that continued use would bind parties to modified contract terms." Def.'s Reply 14 (emphasis added). Truist can modify "these rules and regulations" with notice and "[b]y continuing to maintain your Account, you agree to be bound by and to follow these terms in any and all future actions and transactions."[23] *Id.* But this interpretation contradicts the plain language.

Principles of contract interpretation guide this analysis. *TM Delmarva Power, LLC v. NCP of Va., LLC*, 557 S.E.2d 199, 200 (Va. 2002) ("Contracts between parties are subject to basic rules

---

[23] The Court notes the difference between this provision of the account agreement and the change-in-terms clause in the initial agreement in *Klein*:

> **REVISIONS TO THIS AGREEMENT.**
>
> From time to time [Verizon] will make revisions to this Agreement and the policies relating to the Service. We will provide notice of such revisions by posting revisions to the Website Announcements page or sending an email to your primary Verizon.net email address, or both. . . . [R]evisions . . . shall be effective on the date noted in the posting and/or email we send you. *By continuing to use the Service after revisions are effective, you accept and agree to abide by them.*

*Klein*, No. 1:12cv757, ECF No. 72-1, at 1 (E.D. Va. Feb. 10, 2017) (emphasis added).

of interpretation."). In Virginia, a contract

> is construed as written, without adding terms that were not included by the parties. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.

*Uniwest Constr., Inc. v. Amtech Elevator Servs., Inc.*, 699 S.E.2d 223, 229 (Va. 2010) (citing *PMA Cap. Ins. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372–73 (Va. 2006)).

The provisions above give Truist the right to modify the account agreement. The relevant question then is whether those provisions "explicitly recognize[]" activity by which the Kisers would "demonstrate assent" to modifications to the account agreement. *Klein*, 2017 WL 5071306, at *4 (citing *In re Frye*, 216 B.R. at 171). Truist argues that they do, pointing to the following provision: "By continuing to maintain your Account, you agree to be bound by and to follow these terms in any and all future actions and transactions." ECF No. 22-1, at 9.

Reading the first page of the agreement reveals the flaw in Truist's argument. With limited exceptions (discussed below), the provisions use "these" to modify "rules and regulations." "These" is the plural of "this" which is "used to indicate a person, thing, idea, state, event, time, remark, etc., as present, near, just mentioned or pointed out, supposed to be understood, or by way of emphasis." *This*, Dictionary.com, https://www.dictionary.com/browse/this [https://perma.cc/HVQ8-THLX] (last visited Aug. 6, 2025). Thus, "these rules and regulations" or "these terms" refers to the version in effect at that time—not future ones. By keeping an account open, a customer agrees to follow and be bound by the account agreement as it exists at that moment, not versions that might come later.

The surrounding context supports this interpretation. The change-in-terms clause appears two paragraphs earlier, not alongside the continued maintenance clause; they do not flow as

Truist's spliced quotations might suggest. Second, after discussing Truist's ability to modify the rules and regulations, it states that when "these rules and regulations change a copy of *the revised rules and regulations* will be available" at a branch or online—distinguishing between current and future terms, using the modifier "these" for the former and "the revised" for the latter. The provision Truist relies on does *not* say "[b]y continuing to maintain your account, you agree to be bound by and to follow *the revised rules and regulations*, as one might expect if that provision applied to modifications to the rules and regulations." This confirms "these" refers only to the then-current terms.

The Court also notes that Truist appears to implicitly recognize this interpretation when arguing the Kisers agreed to the account agreement *in the first instance*:

- "[T]he Kisers *manifested their assent to the Rules and Regulations*, and the Arbitration Agreements contained therein, simply by opening *and maintaining their accounts* with Truist Bank and its predecessor SunTrust[.]" Def.'s Mem. 26 (emphasis added).
- "Thus, under the plain terms of the Rules and Regulations, *the Kisers agreed to and accepted the terms of the Rules and Regulations* and the broad Arbitration Agreements contained therein, *simply by engaging in the specific conduct* recognized by the contract as sufficient to manifest their assent – opening and *maintaining each of their accounts* with Truist Bank and its predecessor." *Id.* at 27 (emphasis added) (citation omitted).

The 2019 account agreement (or any other account agreement in the record) does not contain any "provisions saying that continued use will bind parties to *modified contract terms*." *Gillam*, 2018 WL 3744019, at *3 (emphasis added) (citing *Klein*, 2017 WL 5071306, at *4); *see*

*also Wright*, 2008 WL 11380008, at *1 (discussing a bank services agreement that provided, among other things, that "[c]ontinued use of your account following notice of amendment or a charge to the account constitutes your acceptance of such changes"). The account statement notice did not provide for any activity that would constitute acceptance of the modified account agreement, and the initial agreements—the "governing contract provision[s]"—do not "explicitly recognize[]" activity that would constitute acceptance of a *subsequent modification* to the initial agreement. *Klein*, 2017 WL 5071306, at *4. Therefore, it is immaterial that Truist notified the Kisers of any modifications to the account agreement in 2020 because there is no evidence that they manifested assent to those modifications.[24] Silence alone is insufficient to manifest acceptance of a contract. *Odyssey Imaging, LLC*, 752 F. Supp. 2d at 724 (citing *Phillips*, 643 S.E.2d at 176).

* * *

Neither the account agreements nor any notice of a modification provided that subsequent maintenance of their accounts would constitute acceptance of any such modification. The Kisers, therefore, did not agree to the 2020 account agreement by receiving notice of the same and maintaining their accounts.[25]

**E. Because all versions of the account agreement permit Truist to unilaterally modify any term without notice, any arbitration agreement therein is illusory.**

The Court turns to the Kisers' most salient argument—any agreement to arbitrate was never formed because it lacked sufficient consideration. Pls.' Mem. 18. That is so because Truist's

---

[24] For the same reasons, the Court rejects Truist's argument that the Kisers agreed to the 2019 agreement in the first instance by receiving notice of the same on two other account statements. *See* Def.'s Mem. 11.

[25] Because the relevant terms are the same, this conclusion equally applies to the 2014 and 2016 account agreements.

ability to modify the account agreement without notice renders any agreement to arbitrate therein illusory. Pls.' Mem. 18. The parties have not cited, and the Court has not located, any Virginia authority on point, so the Court must interpret the law as it appears that the Supreme Court of Virginia would.[26] *Liberty Mut. Ins. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992). To "forecast a decision of the state's highest court," the Court may consider, among other things, "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999) (citing *Liberty Mut.*, 957 F.2d at 1156).

As explained below, the change-in-terms clause found in every version of the account agreement in the record—granting Truist unfettered unilateral modification power—renders the arbitration agreement therein illusory and lacking consideration under Virginia law.

**1. An overview of illusory contracts and arbitration agreements.**

A contract is an agreement between two or more parties that mutually assent to be bound by a promised bargained-for-exchange that is supported by consideration. *Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844–45 (Va. 1980). "'To constitute consideration, a performance or a return promise must be bargained for.'" *Sfreddo v. Sfreddo*, 720 S.E.2d 145, 154 (Va. Ct. App. 2012) (quoting Restatement (Second) of Contracts § 71(1) (1981)).[27] The "general rule of law[,]"

---

[26] "Typically, the Fourth Circuit's prediction as to how a state's highest court would resolve a particular issue 'is binding on district courts in this circuit.'" *Trimble v. Am. First Finance, LLC*, No. 1:24cv969, 2025 WL 1114474, at *4 n.6 (D. Md. Apr. 15, 2025) (quoting *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 631 (D. Md. 2015)). The Fourth Circuit, however, has not addressed the issue before the Court.

[27] The Virginia Supreme Court often looks to the statements of law set forth in the Restatement (Second) of Contracts. *See, e.g.*, *Montalla, LLC v. Commonwealth*, 900 S.E.2d 290, 300 n.13 (Va. 2024) (citing Restatement (Second) of Contracts § 205); *Wood v. Martin*, 848 S.E.2d 809, 813 (Va. 2020) (quoting Restatement (Second) of Contracts § 330 cmt. c, illus. 6); *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 269 (Va. 2019) (citing Restatement (Second) of Contracts § 302(1));

according to the Supreme Court of Virginia, is "that, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement. *Both parties must be bound, or neither is bound.*" *Am. Agric. Chem. Co. v. Kennedy & Crawford*, 48 S.E. 868, 870 (Va. 1904) (emphasis added) (first citing 1 Parsons on Contracts (7th ed.) 448–52; then citing Clark on Contracts, 165–71; and then citing *S. Ry. Co. v. Willcox*, 35 S.E. 355 (Va. 1900)). "It is rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists entirely of illusory promises." *Johnson*, 131 F.4th at 178 (citing Restatement (Second) of Contracts § 77).

In other words, "[a] contract is nothing more than an illusory promise, and thereby invalid, where it leaves one party with complete discretion of whether that party chooses to perform." *Muratore v. J. Foster Aesthetics, LLC*, 113 Va. Cir. 414 (2024) (citing *Hercules Powder Co. v. Brookfield*, 53 S.E.2d 804, 809 (Va. 1949)); *see also Doe v. Washington & Lee Univ.*, 439 F. Supp. 3d 784, 792 (W.D. Va. 2020) (finding "Virginia law requires an 'absolute mutuality of engagement between the parties' such that each party is bound and may hold the other party to the agreement" (citation omitted)); *Jackson v. Liberty Univ.*, No. 6:17cv41, 2017 WL 3326972, at *5 (W.D. Va. Aug. 3, 2017) (same).

With these general principles of Virginia contract law in mind, the Court turns to how other courts have applied these principles in the context of the formation of an arbitration agreement. Generally, "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219

---

*Hampton Roads Bankshares, Inc. v. Harvard*, 781 S.E.2d 172, 178 (Va. 2016) (citing Restatement (Second) of Contracts §§ 261, 264).

(10th Cir. 2002) (collecting cases). Most agree that where one party is "free to exercise or not exercise the arbitration clause at its whim," its "performance is entirely optional," and thus the arbitration agreement is illusory. *Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 545 (E.D. Pa. 2019) (citing *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 766, 783 (7th Cir. 2014)); *see also Paxson v. Live Nation Ent., Inc.*, No. 2:24cv907, 2025 WL 894634, at *9 (D. Nev. Mar. 21, 2025) ("Front Gate's promise to arbitrate is not illusory because Front Gate and Live Nation were also bound by the arbitration clause, and *any changes to the terms would not apply to a pending claim.*" (emphasis added)); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065–66 (D. Nev. 2012) ("Most federal courts that have considered this issue have held that if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and unenforceable, especially where there is no obligation to receive consent from, or even notify, the other parties to the contract."); *ACE Cash Express, Inc. v. Cox.*, No. 5-15-1425CV, 2016 WL 4205850, at *5 (Tex. Ct. App. Aug. 9, 2016) (holding that, under Texas law, if one party "can unilaterally modify or terminate the purported arbitration agreement without prior notice to [the other party], that agreement is based upon an illusory promise and thus not enforceable"). "[T]he fundamental concern driving this line of case law is the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations under the agreement by modifying it." *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 209 (5th Cir. 2012).

When faced with an arbitration agreement that includes a unilateral change-in-terms provision, courts in the Fourth Circuit have consistently found such an agreement to be illusory, unless the empowered party is limited in some way. *See, e.g., Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (holding that, under South Carolina law, an arbitration agreement

was illusory because it permitted Hooters, but not the employee, to cancel the agreement with 30 days' notice, Hooters reserved the right to modify the rules "without notice," and "[n]othing in the rules even prohibits Hooters from changing the rules in the middle of an arbitration proceeding"); *Johnson,* 131 F.4th at 179 (holding that, under Maryland law, a change-in-terms clause that allows one party to "change *any* term of [the] Agreement in [its] *sole discretion*, upon such notice to [the other party] as is required by law" was illusory (citing *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656 (2003)); *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 728 (4th Cir. 2025) (holding that, under West Virginia law, "the unilateral right to modify a contract, including an arbitration agreement, does not render an underlying promise illusory *if the modifying party must give reasonable notice of modification*" (emphasis added) (citing *Citizens Telecomms. Co. v. Sheridan*, 799 S.E.2d 144, 152–53 (W. Va. 2017))); *Am. Gen. Life & Acc. Ins. v. Wood*, 429 F.3d 83, 91 n.5 (4th Cir. 2005) (rejecting an argument that an agreement that permitted unilateral modifications was illusory because, among other things, the empowered party's discretion to modify was "limited to prospective disputes and by specific notice requirements"); *Lovinfosse v. Lowe's Home Centers, LLP*, No. 1:23cv574, 2024 WL 3732436 (E.D. Va. Aug. 8, 2024) (finding a change-in-terms clause that permitted the defendant to modify the terms and conditions "in its sole and absolute discretion . . . at any time with or without notice" rendered an arbitration agreement contained therein illusory); *Forbes v. SeaWorld Parks & Ent.*, No. 4:16cv172, 2017 WL 2437348, *5 (E.D. Va. June 2, 2017), *aff'd*, 707 F. App'x 168 (4th Cir. 2017) (noting that although "the arbitration agreement only allowed[ed] Defendant . . . to modify its terms, *the agreement require[d the d]efendant to provide [the p]laintiff with '30 calendar days' notice of any such modifications*" (emphasis added)).

A change-in-terms clause that provides that a party can unilaterally modify any term, and must provide notice only when required by law, is similarly illusory. The Fourth Circuit, citing a general contract law treatise, made this clear in *Johnson*: "The plain language of the clause merely commits Continental to do what it is already required to do by law. That cannot furnish consideration. A bargained-for-exchange by definition assumes that each party will undertake some obligation beyond those already imposed by law." 131 F.4th at 180 (citing 3 Williston on Contracts § 7:42 (4th ed. 2024)).

**2. Because Truist has an unfettered power to unilaterally modify any term of the arbitration agreement, the agreement is illusory and lacks consideration.**

The Kisers cite this Court's decision in *Lovinfosse* as support that the arbitration provision in any version of the account agreement is illusory. 2024 WL 3732436. There, a 31-page-long terms and conditions contained an arbitration provision and a change-in-terms clause that permitted the defendant to modify the terms and conditions "in its sole and absolute discretion . . . at any time with or without notice." *Id.* at *2–3. This Court denied a motion to compel arbitration because the change-in-terms clause rendered the terms and conditions illusory and lacking consideration. *Id.* at *6. The change-in-terms clause in the account agreement here is nearly indistinguishable from the terms and conditions in *Lovinfosse.*

The arbitration provisions in the 2014 and 2016 account agreements begin on pages 25 and 24, respectively. ECF No. 46-4, at 82, 124. The provision in each is several pages long and explains the parties' dispute resolution rights and the arbitration process. ECF No. 46-4, at 82–86, 124–26. The first page of each version of the account agreement contains the following change-in-terms clause:

> When the laws governing your Account require the Bank to provide you written advance notification of a change to the rules and regulations, the Bank will provide

> such notice through a letter, account statement message or other written or electronic notice. *Unless otherwise prohibited or required by applicable law or regulation, the Bank may change from time to time other provisions of these rules and regulations with or without notice.*
>
> When these rules and regulations change, a copy of the revised rules and regulations will be available at any office of the Bank or on the Bank's website at www.suntrust.com/rulesandregulations. . . .

*Id.* at 56 (emphasis added); *see also id.* at 113, 142, 203, 262.

As in *Lovinfosse*, Truist's right to unilateral modification is essentially unfettered. The plain language of the change-in-terms clause permits Truist to unilaterally modify the arbitration agreement[28] *without providing notice*. "A bargained-for-exchange by definition assumes that each party will undertake some obligation beyond those already imposed by law." *See Johnson*, 131 F.4th at 180 (citing 3 Williston on Contracts § 7:42 (4th ed. 2024)). By promising to provide notice only when required by "applicable law or regulation," Truist merely commits to do what the law already requires it to, taking on no additional obligation as consideration for the agreement.

Truist can change the arbitration agreement in any way that it sees fit, including the Kisers' ability to opt out of arbitration (which, as discussed above, it did), Truist's promise to arbitrate, and the terms that are to govern arbitration between the parties. The clause does not include any time-based limitations or restrict Truist's ability to make unilateral, retroactive modifications, meaning that if a customer sought to invoke the arbitration agreement to resolve a dispute with

---

[28] Although this change-in-terms clause does not appear within the arbitration agreement itself, it applies to the arbitration agreement. Truist reserved the right to change "provisions of these rules and regulations." By stating that Truist could modify "these rules and regulations," the change-in-terms clause also provides that Truist reserved the right to modify the arbitration agreement—a provision of the rules and regulations. *See Trimble*, 2025 WL 2021741, at *8. And Truist does not contend otherwise. Three other points confirm this conclusion: (a) the bottom of the first page states, "please review the arbitration agreement in its entirety which begins on page 25 of *these rules and regulations*[,]" ECF No. 46-4, at 56 (emphasis added); (b) the rules and regulations' table of contents includes the "arbitration agreement," *id.* at 57; and (c) the arbitration agreement refers to itself as "this provision," *id.* at 82.

Truist, nothing prevents Truist from unilaterally modifying it if it decided that it no longer wished to arbitrate that dispute. *See In re Zappos.com*, 893 F. Supp. 2d at 1066.

In essence, Truist never agreed to be bound by anything. Truist retained the ability to hold the Kisers to their promises while also reserving for itself a unilateral escape hatch to activate whenever it sees fit. Returning to where the Court started—general principles of Virginia contract law—such an arrangement "is nothing more than an illusory promise, and thereby invalid," because "it leaves [Truist] with complete discretion of whether [it] chooses to perform." *Muratore*, 113 Va. Cir. 414 (citing *Hercules Powder Co.*, 53 S.E.2d at 809). It also violates the Supreme Court of Virginia's clear demand that "there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement." *Am. Agric. Chemical Co.*, 48 S.E. at 870.

Truist contends (without any support) that Virginia "is likely to follow the approach of jurisdictions finding agreements providing for unilateral modification are enforceable." Def.'s Suppl. Br. 12. Beyond summarizing the holdings of various cases, Truist does not cite *one* Virginia case or secondary source to support this broad and sweeping assertion. *Id.* at 12–20. Because the Court concludes that the cases Truist cites are inapposite, Truist's argument is not persuasive.

First, cases addressing procedural unconscionability are irrelevant. *Id.* at 12 (citing *RV Kountry v. Truist Bank*, No. 2:24cv36, 2025 WL 744271, at *4 (M.D. Fla. Mar. 7, 2025)). Whether the arbitration agreement is illusory is a question of contract formation, but unconscionability is one of enforceability. *See Johnson*, 131 F.4th at 178 ("It is rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists entirely of illusory promises." (citing Restatement (Second) of Contracts § 77)). Thus, it is irrelevant that the court in *RV Kountry* "reject[ed an] argument that Truist's unilateral change-in-terms language was

substantively unconscionable[.]" Def.'s Suppl. Br. 12 (citing *RV Kountry*, 2025 WL 744271, at *4).

Second, as discussed above, the account agreement does *not* require Truist to give notice of unilateral modifications. *See* ECF No. 46-4, at 56 ("Unless otherwise prohibited or required by applicable law or regulation, [Trust] may change from time to time other provisions of these rules and regulations with *or without notice*." (emphasis added)). So cases where courts have found unilateral change-in-terms provisions "enforceable where notice has been provided" are similarly of no consequence here.[29] Def.'s Reply 12.

Third, Truist's reliance on *Klein*, 2017 WL 5071306, to argue that "Virginia courts are likely to follow courts that permit agreements with unilateral change-in-terms provisions" is perplexing. *Id.* at 13–16. Truist notes that "*Klein* involved a dispute over whether the parties had *agreed* to a [subsequent] modification, containing an arbitration provision, or a prior agreement that did not contain [one]." *Id.* at 13 (emphasis added) (citing *Klein*, 2017 WL 5071306, at *2).

---

[29] Truist appears to argue that posting the modified account agreement on its website would provide sufficient notice to the Kisers. Def.'s Reply. 15; *see also, e.g.*, ECF No. 46-4, at 82 (providing that when the account agreement changes, a copy of the revised agreement "will be available . . . on the Bank's website"). The Court disagrees. Simply posting the modified agreement on a website does nothing to *notify* the Kisers that Truist modified the agreement in the first place. The Kisers have no obligation to consistently monitor Truist's website to track when the account agreement changes. There is no evidence that Truist posted the modified agreement on the Kisers' online banking portal, such that they would be on notice of it, or that the Kisers had to acknowledge the modified agreement. *See, e.g.*, *Dhruva v. Curiosity Stream, Inc.*, 131 F.4th 146, 149–50 (4th Cir. 2025). Nor is there evidence that, when posting the modified agreement, Truist would even indicate that it was modified or its effective date. None of the account agreements in the record has an effective date noted. The Court could discern that information only through Ms. Hartwell's declaration. In other words, if one currently bound to the 2019 account agreement was to view the 2020 account agreement on Truist's website, it is nearly impossible to discern that the 2019 version was modified absent combing through the terms to identify differences. Essentially, Truist can replace the account agreement on its website with a revised version at any time, without providing notice of the change, and without disclosing that the revised version is, in fact, revised. This is not reasonable notice of a modification.

And there the fatal flaw lies—Truist argues extensively about *Klein*'s *mutual assent* discussion, while illusoriness is concerned with consideration, a distinct element of contract formation. Determining whether a party *agrees* to changes to an initial agreement and whether the parties formed an initial agreement in the first place involves different and independent legal principles.[30]

Lastly, Truist cites several cases that have found that a unilateral change-in-terms provision without notice does not render a contract illusory because the party with unilateral power is constrained by the duty of good faith and fair dealing. Def.'s Suppl. Br. 12–13, 18 (first citing *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal App. 4th 1199, 1214 (Cal. Ct. App. 1998); then citing *Bassett v. Elec. Arts., Inc.*, 93 F. Supp. 3d 95, 106 (E.D.N.Y. 2015); then citing *Larsen v. Citibank FSB*, 871 F.3d 1295, 1318 (11th Cir. 2017); and then citing *Canteen v. Charlotte Metro Credit Union*, 900 S.E.2d 890, 894–95 (N.C. 2024)). Virginia, however, is unlikely to adopt this approach because it is inconsistent with existing case law on the implied covenant.

"Any new law student learns the distinction between contract formation and validity." *Johnson*, 131 F.4th at 176. On the one hand, "[a] claim that a contract was never *formed* negates one of the two essential elements of a contract—mutual assent and consideration." *Id.* (citing Restatement (Second) of Contracts § 17(1)). On the other hand, "a claim that a contract is *invalid* presupposes the existence of a contract but maintains that it should not be enforced." *Id.* (citing Restatement (Second) of Contracts §§ 7–8). The Kisers' argument that the arbitration agreement is illusory is one of contract formation—because Truist retained a unilateral modification right without notice, any promises that it may have made were illusory, and thus the account agreement lacks consideration. *Id.* at 178 (citing Restatement (Second) of Contracts § 77). In other words,

---

30 Truist's discussion of *Sonza v. 1st Advantage Fed. Credit Union*, No. 4:22cv114, 2023 WL 8535005 (E.D. Va. Oct. 5, 2023) is unpersuasive for the same reason. Def.'s Suppl. Br. 16.

the Kisers contend that there was never a contract between Truist and them governed by the account agreement.

With that context, it is antithetical that the implied covenant of good faith and fair dealing would render an otherwise unformed contract formed. Such an argument puts the cart before the horse. In Virginia, "every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." *Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008); *see also Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 385 (Va. 1996). A prerequisite to bringing such a claim is "a contractual relationship between the parties[.]" *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing *Charles E. Brauer Co.*, 466 S.E.2d at 385).

Even if the Court were to put the cart before the horse, in Virginia, a party does not violate the obligation to act in good faith by "enforcing a contractual right[.]" *Albright v. Burke & Herbert Bank & Tr. Co.*, 457 S.E.2d 776, 778 (Va. 1995). "[W]hen parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equip. v. New Holland N. Am.*, 493 S.E.2d 516, 520 (Va. 1997). A party cannot use the implied covenant to do an end-run around contractual duties. *Id.* In other words, if Truist unilaterally modifies the account agreement without providing notice—which the agreement permits—there can be no implied breach because doing so is an "activity governed by express contractual terms[.]" *Skillstorm, Inc. v. Elec. Data Sys., L.L.C.*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009) (quoting *Ward's Equip., Inc.*, 493 S.E.2d at 520.

The Court asked the parties for supplemental briefing addressing what effect, if any, *Johnson*, 131 F.4th 169, has on this dispute. ECF No. 49. In *Johnson*, the Fourth Circuit held that

a change-in-terms clause that allowed one party to "change any term of [the] Agreement in [its] sole discretion, upon such notice to [the other party] as is required by law," rendered an arbitration agreement illusory under Maryland law. 131 F.4th at 179, 181. In so holding, the court found that the case was "indistinguishable from" the Supreme Court of Maryland's decision in *Cheek*, 835 A.2d 656. *Id.* Maryland law does not apply here. But the general principles of contract law in *Johnson* are persuasive and consistent with Virginia contract law.

Truist argues that *Johnson* is irrelevant because it applied Maryland law while Virginia law governs here, and Virginia would "likely disagree with *Cheek*, the underlying basis of *Johnson*" based on this Court's decision in *U.S. ex rel. Harbor Constr. Co. v. T.H.R. Enterprises, Inc.*, 311 F. Supp. 3d 797 (E.D. Va. 2018) ("*Harbor*"). Def.'s Suppl. Br. 8–12. But it is not the Court's role to determine whether Virginia would fall in line with Maryland, but whether the change-in-terms clause renders the arbitration agreement illusory under Virginia law. *Liberty Mut. Ins.*, 957 F.2d at 1156. And this Court's decision in *Harbor*, and its underlying principles, is of little help.

In *Harbor*, this Court was tasked with determining whether an arbitration agreement that required only one party to submit disputes to arbitration was illusory. 311 F. Supp. 3d at 800. Absent a Virginia case on point, this Court contrasted North Carolina and West Virginia law, where parties need not be bound to the same arbitration obligations if the contract is supported by adequate consideration, *id.* at 802–803 (first citing *Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550, 553 (4th Cir. 2007); and then citing *Dan Ryan Builders, Inc.*, 737 S.E.2d 550 (W. Va. 2012)), with Maryland law, which requires a mutual obligation to arbitrate regardless of other consideration, *id.* at 802 (citing *Cheek*, 835 A.2d at 669). It concluded that "Virginia law aligns with West Virginia and North Carolina law on the issue[,]" because "a contract can be sufficiently mutual in its obligations, and thus have adequate consideration, even if some conditions of the contract are

imposed on one party and not the other." *Id.* at 803 (citing *C.G. Blake Co. v. W.R. Smith & Son*, 133 S.E. 685, 688–89 (Va. 1926)). In other words:

> Mutuality of contract [is] sufficiently complied with when there are promises on each side that something shall be done for the benefit of the other side, furnishing therefor considerations by each party, *although they may relate to different terms of the contract* and may be conditioned upon performance by the other party.

*Id.* (quoting *C.G. Blake*, 133 S.E. at 688). "[A]s long as the contract as a whole is supported by adequate consideration, an arbitration provision need not impose a mutual obligation to arbitrate in order to be valid." *Id.* (footnote omitted).

The parties do not dispute that the arbitration provision in all versions of the account agreement impose mutual obligations on Truist and customers to arbitrate disputes. Thus, whether a hypothetical agreement that binds only the Kisers to arbitrate disputes is illusory is of little relevance to whether an agreement that grants Truist an unfettered unilateral modification power is illusory. As discussed above, the concern with an illusory agreement is not limited to Truist's ability to reverse its promise to arbitrate.

A closer look at the Supreme Court of Maryland's decision in *Cheek* confirms this. In *Cheek*, an "*arbitration policy*" had a change-in-terms clause that permitted the defendant "to alter, amend, modify, or revoke the [p]olicy at its sole and absolute discretion at any time with or without notice." 835 A.2d at 658. There are two holdings in *Cheek*. First, the change-in-terms clause rendered the policy illusory and lacking consideration because any promise the defendant made was "no real promise at all" as "the plain and unambiguous language of the clause appears to allow [the defendant] to revoke the [policy] even after arbitration is invoked, and even after a decision is rendered, because [the defendant] can 'revoke' the [p]olicy 'at any time.'" *Id.* at 662. Second, the defendant's continued employment of the plaintiff was insufficient consideration in return for the plaintiff's promise to arbitrate because there must be a "mutual exchange of promises to

arbitrate." *Id.* at 665. The court found "inapposite" an Appellate Court of Maryland decision that held that continued employment was sufficient consideration for a post-employment covenant not to compete because "in determining whether an arbitration agreement contained within a larger agreement is enforceable, courts are limited to determining only one thing: whether a valid arbitration agreement exists." *Id.* at 665–66 (citing *Simko, Inc. v. Graymar Co.*, 464 A.2d 1104 (Md. App. Ct. 1983)).

In *Harbor*, this Court found that Virginia likely would not adopt *Cheek*'s second holding. 311 F. Supp. 3d at 803 (finding "an arbitration provision need not impose a mutual obligation to arbitrate in order to be valid"). It relied on a 1926 opinion from the Supreme Court of Virginia that, discussing general principles of contract law, held that a contract in which each side may make *promises* for the benefit of the other, "although they may relate to different terms of the contract[,]" has sufficient mutuality of contract. *C.G. Blake*, 133 S.E. at 688. But it said nothing about *Cheek*'s first holding—that an unfettered change-in-terms clause rendered an agreement illusory—which was premised on general principles of contract law that are of equal force in Virginia. *Cheek*'s first holding is consistent with "[m]ost federal courts that have considered this issue" finding "that if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and unenforceable[.]" *In re Zappos.com*, 893 F. Supp. 2d at 1065–66. For these reasons, Truist's attempt to extrapolate *Harbor* is unpersuasive. Although *Johnson* is not binding, much of its reasoning—grounded in general contract law—is helpful and consistent with Virginia case law. *See, e.g.*, 131 F.4th at 178 ("It is rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists entirely of illusory promises." (citing Restatement (Second) of Contracts § 77)); *id.* at 180 ("A bargained-for-

exchange by definition assumes that each party will undertake some obligation beyond those already imposed by law." (citing 3 Williston on Contracts § 7:42 (4th ed. 2024)).

On a related point, Truist argues that even if the arbitration agreement is illusory, "there can still be consideration for the contract as a whole." Def.'s Suppl. Br. 11. This argument, however, is legally untenable under all versions of the account agreement in the record, which provide:

> These rules and regulations constitute a contract and agreement between you and the Bank. This current version of these rules and regulations supersedes all prior versions, discussions and agreements and contains the terms governing your Account. . . . These rules and regulations cannot be changed or modified orally.

*See, e.g.*, ECF No. 46-4, at 56. According to the account agreement, then, there *cannot be another contract* between the customer and Truist. Because the account agreement is subject to the change-in-terms clause, Truist again is not bound by anything and there is no consideration as discussed above.

* * *

The change-in-terms clause applicable to all the arbitration agreements in the record gives Truist unchecked power to unilaterally rewrite the arbitration agreement at any time *without notice*. More than just eliminating its own promise to arbitrate, Truist can alter core rules of the road at any time—including the arbitral forum, appellate rights in the arbitral process (including the standard of review), the qualifications of the arbitrator, and, "notabl[y]" eliminate the customers' ability to opt out of the arbitration agreement, *see* Def.'s Mem. 19 n.30. These changes can apply retroactively, and Truist need not even provide notice of the same. "Both parties must be bound, or neither is bound." *Am. Agric. Chem. Co.* 48 S.E. at 870. Truist is not bound to anything. This is not a mutual agreement as required by Virginia law; it is strictly one-sided.

## IV. CONCLUSION

The Kisers agreed to arbitrate disputes[31] with Truist—Mr. Kiser through the 2014 account agreement and Ms. Kiser through the 2016 account agreement. But the change-in-terms clause in both agreements (and all other agreements in the record) renders any agreement to arbitrate illusory. As in *Lovinfosse*, the Court "is hesitant to give effect to an agreement whereby [the Kisers are] bound by all the terms in the [account agreement], including the arbitration provision, while [Truist] can simply revoke any term, whenever it desires." 2024 WL 3732436, at *6. Because there is no agreement to arbitrate, the Court cannot compel the Kisers to do so.[32]

Therefore, Truist's renewed motion to compel arbitration and stay this proceeding, ECF No. 45, is **DENIED**. The stay of Truist's responsive pleading deadline, ECF No. 28, is **LIFTED**, and Truist is **ORDERED** to file responsive pleadings to the Kiser's amended complaint, ECF No. 25, **within 21 days** of the entry of this memorandum opinion and order.

The Clerk is **DIRECTED** to send a copy of this memorandum opinion and order to all counsel of record.

**IT IS SO ORDERED.**

/s/
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
August 8, 2025

[31] The Court does not address whether *this* dispute is in the scope of the arbitration agreements.

[32] Ordinarily, the FAA provides for a jury trial to resolve genuine disputes of material fact on whether an arbitration agreement was formed. *Chorley*, 807 F.3d at 564 (citing 9 U.S.C. § 4). Although the Court concludes that there are genuine disputes of material fact that preclude finding that the Kisers agreed to the 2019 account agreement, it is not necessary to submit that issue to a jury for resolution. Regardless of what version of the account agreement is operative—2014, 2016, 2019, or 2020—all contain the same change-in-terms clause, and, as a matter of law, any arbitration agreement contained therein is illusory and lacks consideration.